LEONARD LORIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lorin v. Commissioner
Docket No. 9626-86
United States Tax Court
T.C. Memo 1993-80; 1993 Tax Ct. Memo LEXIS 82; 65 T.C.M. (CCH) 2028; March 9, 1993, Filed *82 Decision will be entered for petitioner. For petitioner: Victoria Quesada. For respondent: Margaret C. Tinagero and Peggy Gartenbaum. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined a tax deficiency of $ 379,624 and an addition to tax under section 6653(b)(1) of $ 189,812 in petitioner's Federal income tax for taxable year ending December 31, 1980. All section references are to the Internal Revenue Code as in effect for that year. The principal issues for decision are: (1) Whether petitioner realized $ 549,000 from the sale of stolen bonds which he failed to report as income in 1980; and (2) if there is an underpayment of tax, whether any part of it is due to fraud. FINDINGS OF FACT Some of the facts have been stipulated by the parties. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the subject petition was filed, petitioner resided in Great Neck, New York. Petitioner is an attorney admitted to practice in the State of New York. During 1980, he engaged in the general practice of law with an emphasis on real estate, matrimonial, and corporate law. He maintained a law office on the third floor *83 of a building located at 186 Joralemon Street in Brooklyn, New York. In June of 1980, petitioner asked Mr. Robert Keenan to check the authenticity of certain bonds. Mr. Keenan was then employed by Lennon Sales Corp., a subsidiary of a Swiss bank which was one of petitioner's clients. Previously, Mr. Keenan had been employed by Citibank and his duties included determining whether bonds were valid, stolen, or forged, or had stops or blocks. When Mr. Keenan came to petitioner's office to examine the bonds, a third individual was present. Petitioner did not introduce Mr. Keenan to this person, but he had seen him previously in the suite of offices. Petitioner handed to Mr. Keenan 10 City of New York Municipal Assistance Corp. bonds, serial numbers 9C-1468, 9C-1477, 9C-1478, 9C-1479, 9C-1480, 9C-1481, 9C-1482, 9C-1483, 9C-1484, and 9C-1485. Each of the bonds was in the principal amount of $ 100,000 and carried interest coupons payable semiannually at the annual rate of 7-1/2 percent. All of the bonds had been issued on September 1, 1977, and were to mature on July 1, 1992. In this opinion, we refer to these bonds as MAC bonds. Mr. Keenan placed a telephone call to the issuing *84 agent of the MAC bonds, United States Trust Co., and was told that there were no blocks or holds on the bonds and that they were still outstanding. After informing petitioner of the status of the MAC bonds, Mr. Keenan left petitioner's office. Contrary to the information obtained by Mr. Keenan, the MAC bonds had been stolen from the custody of Shearson American Express. Shearson did not report to the Federal Bureau of Investigation or to the Securities and Exchange Commission that the MAC bonds were missing from its vault until sometime after February 6, 1981. At the time of Mr. Keenan's inquiry, there had also been stolen from Shearson American Express three Onondaga County Anticipation Notes, numbers 128, 129, and 130, each with a face value of $ 25,000 and a maturity date of July 3, 1980. We refer to these instruments as OCAN's. Shearson did not report to the FBI or to the SEC that the OCAN's were missing from its vault until sometime after they were redeemed. During the summer of 1980, petitioner was involved in the sale of the 10 MAC bonds to six individuals. Two of the MAC bonds, serial numbers 9C-1477 and 9C-1480, are not at issue in this proceeding. They were sold *85 to Messrs. Luhrs and Lubin. The other eight MAC bonds were sold to four other individuals. The actions which petitioner took in connection with these sales are described below. Mr. Hyman Kaplan
Petitioner had known Mr. Hyman Kaplan for over 25 years. The two had attended law school together and in 1980, Mr. Kaplan practiced law in Brooklyn, New York, in the same suite of offices as petitioner. In June of 1980, petitioner introduced Mr. Hyman Kaplan to Mr. John Gelardi. Petitioner later told Mr. Kaplan that he was acting as Mr. Gelardi's attorney and, on Mr. Gelardi's behalf, petitioner offered to sell one MAC bond to Mr. Kaplan for $ 55,000. Mr. Kaplan agreed to purchase two MAC bonds with a total face value of $ 200,000 for $ 100,000 subject to a "buy back agreement" under which Mr. Gelardi had the option to repurchase the bonds at the same price. Petitioner told Mr. Kaplan that payment for the bonds had to be made in cash. Petitioner gave two MAC bonds, serial numbers 9C-1484 and 9C-1485, to Mr. Kaplan in late June of 1980. Mr. Kaplan gave no money to petitioner at that time. On June 30, 1980, Mr. Kaplan used the two MAC bonds as collateral for a $ 100,000 loan *86 from the National Bank of North America. Mr. Kaplan withdrew the loan proceeds in increments of less than $ 10,000 in order to avoid the currency reporting requirements. When Mr. Kaplan told petitioner that he had the funds available to make payment for the bonds, petitioner told Mr. Kaplan that he would send Mr. Vincent Albano, who was a longstanding friend of both petitioner and Mr. Kaplan, to pick up the payment for the bonds. Subsequently, Mr. Albano came to Mr. Kaplan's home. Mr. Albano told Mr. Kaplan that "Mr. Gelardi was outside waiting for him in his car" and that Mr. Albano would turn the money over to Mr. Gelardi. Sometime later, Mr. Kaplan received a receipt signed by "John Gelardi" and a "buy back agreement" for each of the two bonds. The "buy back agreement" is in the form of a letter dated June 30, 1980, to Mr. Gelardi under which Mr. Kaplan agreed that "any time between July 1, 1981 and December 31, 1981," Mr. Gelardi could repurchase the same bond or "a similar Big Mac" for $ 50,000. In that event, the letter stipulated that Mr. Kaplan could retain the January 1982 interest coupon. In July of 1980, Mr. Kaplan repaid the loan to the National Bank of North America. *87 Mr. Alvin Meiseles
In July of 1980, petitioner contacted Mr. Alvin Meiseles. Petitioner and Mr. Meiseles' wife are cousins and petitioner had known Mr. Meiseles for approximately 20 years. After some preliminary negotiations, petitioner told Mr. Meiseles that Mr. Gelardi had agreed to sell one MAC bond, serial number 9C-1478, to Mr. Meiseles for $ 45,000, subject to the "buy back agreement" described below. Petitioner told Mr. Meiseles that payment for the bond had to be made in cash. Mr. Meiseles told petitioner that it would be difficult for him to raise that amount of cash in a short period of time. Nevertheless, on July 10, 1980, Mr. Meiseles gave $ 20,000 to petitioner as a downpayment and petitioner gave the bond to Mr. Meiseles. Mr. Meiseles signed a letter dated July 10, 1980, acknowledging receipt of the MAC bond and agreeing that by 2 p.m. on July 14, 1980, he would either return the bond to petitioner upon receipt of his down payment of $ 20,000, or he would pay the balance due of $ 25,000. On July 15, 1980, Mr. Meiseles took the MAC bond to National Community Bank and used it as collateral for a loan in the amount $ 25,000. Mr. Meiseles then withdrew the *88 proceeds of the loan and paid them to petitioner in cash. Petitioner gave Mr. Meiseles a receipt signed "John Gelardi" which erroneously states that consideration of $ 50,000, rather than $ 45,000, had been paid for the bond. Mr. Meiseles also signed a letter dated June 30, 1980, to John Gelardi under which he agreed that "any time between July 1, 1981 and December 31, 1981," Mr. Gelardi could repurchase the same bond or "a similar Big Mac" for $ 50,000. In that event, the letter stipulated that Mr. Meiseles could retain the January 1982 interest coupon. On or about October 1, 1980, Mr. Meiseles sold MAC bond number 9C-1478 through his broker, Halpert, Oberst and Co. The confirmation of that sale shows that the bond was sold for principal of $ 78,000 and interest of $ 2,020.83. Two or three months after the sale, his broker telephoned and informed him that the FBI was looking into the sale. Messrs. Ralph E. Lang and Terence J. Hanbury
In June of 1980, Mr. Albano contacted Mr. Ralph E. Lang and asked if he wanted to purchase some MAC bonds. Mr. Lang was living in Florida where Mr. Albano also had a home. Mr. Lang frequently bought and sold municipal bonds. Shortly *89 thereafter, Mr. Lang flew to New York to inspect the bonds. Mr. Albano met him at the airport and drove him to petitioner's office. There is conflicting testimony in the record about when Mr. Lang visited petitioner's office and what took place there. We discuss those facts below. At some point while Mr. Lang was in New York, he telephoned Mr. James Klotz, president of First Miami Securities, at his office to determine if certain of the MAC bonds described above had been reported as lost, stolen, or counterfeit. Mr. Lang described the bonds, including serial numbers, to Mr. Klotz. Later that day, Mr. Lang again telephoned Mr. Klotz and Mr. Klotz told him that the bonds were legitimate. When Mr. Lang returned to Florida, he had in his possession two MAC bonds, serial numbers 9C-1468 and 9C-1479, and possibly others. Mr. Lang deposited one MAC bond, serial number 9C-1468, with Singer Island National Bank with instructions to sell the bond and deposit the proceeds to his account. On July 11, 1980, the proceeds of that bond, $ 89,416, were deposited into his account. On June 30, 1980, Mr. Lang deposited the three stolen OCAN's into his account at Singer Island National Bank in *90 Riviera Beach, Florida, for collection. The transaction did not clear until July 29, 1980, at which time the bank credited the aggregate face value of the OCAN's, $ 75,000, to Mr. Lang's account. Subsequently, on August 8, 1980, interest on the OCAN's in the amount of $ 4,046 was credited to Mr. Lang's account. After Mr. Lang was first contacted by Mr. Albano about purchasing the subject bonds, Mr. Lang contacted Mr. Terence Hanbury, a Florida insurance agent, who had originally introduced Mr. Lang to Mr. Albano several years earlier. Mr. Hanbury was interested in purchasing one or more MAC bonds. At Mr. Lang's suggestion, he contacted Mr. Albano to discuss purchasing a MAC bond. Mr. Albano told Mr. Hanbury that he could purchase a MAC bond for $ 50,000, subject to the seller's right to repurchase the bond for the same amount, but, in that event, he would be entitled to retain the interest coupon which became due. Mr. Hanbury told Mr. Albano that he did not have sufficient funds available to purchase a bond. Mr. Albano later told Mr. Hanbury that he could take a MAC bond, cash it, and then use the proceeds to pay for it. Mr. Hanbury agreed to purchase two MAC bonds for a *91 total purchase price of $ 100,000, with delivery of the first bond immediately, and delivery of the second bond after payment was made for both bonds. When Mr. Lang returned to Florida from his trip to New York, he delivered MAC bond serial number 9C-1479 to Mr. Hanbury. The interest coupon dated July 1, 1980, had been removed from the bond. Mr. Hanbury did not pay Mr. Lang for the bond. Mr. Hanbury contacted Paine Weber to check the authenticity of the MAC bond and learned that it had no blocks or holds. On July 1, 1980, he deposited the bond for collection with the First American Bank of Palm Beach County. He received approximately $ 89,000 for the bond. Shortly thereafter, he contacted Mr. Albano and told him that he had the cash payment available. On July 11, 1980, petitioner flew to Florida. He was met at the airport by Mr. Albano and his wife. Petitioner and Mr. Albano went to meet with Mr. Hanbury at his office. Mr. Albano introduced Mr. Hanbury to petitioner and left the room. Mr. Hanbury gave petitioner $ 100,000 in cash, $ 89,000 from the sale of the MAC bond, serial number 9C-1479, and the remainder from his personal funds. In exchange, petitioner gave Mr. Hanbury *92 a second MAC bond, serial number 9C-1482. Petitioner also gave him two receipts, one for each bond, which had been signed "John Gelardi". Neither receipt contained the purchase price for the bond. Petitioner told Mr. Hanbury to fill in the amount as he wanted to. Petitioner and Mr. Albano then met Mr. Lang and accompanied him to Singer Island National Bank where he withdrew $ 80,000 from his account in the form of 10 cashier's checks. Mr. Lang cashed four cashier's checks and gave petitioner $ 40,000 in cash, in part payment for MAC bond serial number 9C-1468. Mr. Lang also gave cashier's checks to Mr. Albano which had been endorsed to the order of Mr. Albano's brother, Mr. Nicholas Albano. Petitioner flew back to New York on July 11, 1980. Mr. Albano accompanied him. Mr. Gelardi met them at the airport and the three men went to petitioner's office. Petitioner gave the currency, totaling $ 140,000, to Mr. Gelardi. Messrs. Albano and Gelardi then left petitioner's office. On August 1, 1980, petitioner made a second trip to Florida at Mr. Gelardi's behest. Petitioner and Mr. Albano once again met Mr. Lang outside the Singer Island National Bank. Mr. Lang came into Mr. *93 Albano's van and asked petitioner to write down the amounts of a number of cashier's checks which he had with him. The checks totaled $ 115,000. Mr. Lang went into the bank and returned with currency which he gave to petitioner. Petitioner delivered to Mr. Lang three bills of sale for certain MAC bonds which Mr. Gelardi had asked him to deliver. After his meeting with Mr. Lang, petitioner flew back to New York. Mr. Albano accompanied him on the plane. Mr. Gelardi met them at the airport and the three men went to petitioner's office, where petitioner gave the money to Mr. Gelardi in exchange for a receipt. In June of 1981, petitioner and Messrs. Lang and Albano were indicted in the Southern District of Florida with respect to the MAC bonds. They were charged with conspiring to knowingly and willfully transport stolen securities valued in excess of $ 5,000 in interstate commerce in violation of 18 U.S.C. section 2314. In addition, Messrs. Lang and Albano, but not petitioner, were indicted for the same offense with respect to the three stolen OCAN's. After trial, the District Court granted the defendants' motion for acquittal on all counts *94 finding that "the evidence against the defendants is overwhelmingly circumstantial in nature." Subsequently, the Commissioner determined a deficiency in tax and additions to tax with respect to Mr. Lang's 1980 income tax. Among other adjustments, the Commissioner increased Mr. Lang's income by $ 304,000, the amount he claimed to have paid petitioner for MAC bonds, serial numbers 9C-1468, 9C-1481, and 9C-1483, and OCAN's 128, 129, and 130. The Commissioner also determined that Mr. Lang had realized unreported income during 1980 in the amount of $ 250,212.50, consisting of the proceeds of the sale of two MAC bonds on behalf of Mr. Kaplan and one MAC bond on behalf of Mrs. Lubin. As discussed below, Mr. Lang had allowed Mr. Kaplan and Mrs. Lubin, acting for her husband, to sell their bonds through Mr. Lang's accounts at Goldman Sachs and First Miami Securities. Mr. Lang filed a petition for redetermination of that deficiency in this Court. During the trial of that case, the Court received evidence concerning Mr. Lang's purchase of the bonds at issue. Petitioner did not testify during that trial. The Court's Memorandum Findings of Fact and Opinion in that case is filed at Lang v. Commissioner, T.C. Memo. 1983-318. *95 Respondent also determined the deficiency at issue in this case. Respondent's determination is based on the proposition that during 1980 petitioner realized $ 549,000 from the sale of the stolen bonds, including $ 304,000 from Mr. Lang, which amount petitioner failed to include in the gross income reported on his individual income tax return for 1980. Set forth below is a schedule of the purchasers, amounts paid, and bond serial numbers, purportedly received by petitioner during 1980 from the sale of the stolen bonds: Purchaser
Purchase Price
MAC Bond numbers
OCAN numbers
Terence J. Hanbury
$ 100,000
9C-1479, 1482
Hyman Kaplan
100,000
9C-1484, 1485
Alvin Meiseles
45,000
9C-1478
Ralph Emerson Lang Jr.
304,000
9C-1468, 1481, 1483
128, 129, 130
Total $ 549,000
OPINION There are two issues to be decided in this case. The first is whether respondent correctly determined that petitioner failed to report and pay tax on gross income in the amount of $ 549,000. Respondent determined that during the summer of 1980 petitioner received that amount from the sale of the stolen bonds, described above. Respondent treated the bonds as ordinary assets, as opposed *96 to capital assets, in petitioner's hands, and allowed petitioner no basis in any of the bonds. Accordingly, respondent included all of the proceeds from the bond sales in petitioner's gross income for 1980. In effect, respondent treated petitioner as if he received the proceeds from the bond sales under a claim of right and without restriction as to their disposition. See North American Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932). Petitioner bears the burden of disproving respondent's determination. Rule 142, Tax Court Rules of Practice and Procedure (hereinafter, all Rule references are to the Tax Court Rules of Practice and Procedure). The second issue is whether petitioner's failure to report $ 549,000 as income in 1980 was due to fraud. Respondent bears the burden of proving that petitioner is liable for the addition to tax for fraud, as determined in the notice of deficiency. Sec. 7454(a); Rule 142(b). Aside from certain factual questions raised by petitioner concerning the amount of proceeds which he received from the sale of the bonds, both of the above issues turn on the credibility of petitioner's explanation that he was acting *97 on behalf of a client, Mr. John Gelardi, and that he delivered all of the proceeds which he received from the sale of the subject bonds to Mr. Gelardi. If we find that petitioner's explanation is true, then we must hold that the sale of each of the subject bonds was made by petitioner's client. In that event, the client, rather than petitioner, would be subject to tax on the proceeds. In that event, we must also hold that petitioner is not subject to the addition to tax for fraud asserted by respondent. On the other hand, if we find that petitioner's explanation is false, then we must hold that he is subject to tax on the sales proceeds, as determined by respondent. In that event, we would consider whether petitioner was liable for the addition to tax for fraud. Petitioner testified that he was introduced to Mr. Gelardi by Mr. Albano, who had referred a number of clients to him over the years. According to petitioner, Mr. Gelardi told him that he was a retired jeweler who was interested in purchasing brownstones on South Elliot Place in Brooklyn and converting them to condominiums or "coops". Petitioner further explains that Mr. Gelardi proposed to finance his acquisition of *98 such real estate with the 10 MAC bonds, described above, which were acquired with the proceeds of the sale of his jewelry business. According to petitioner, Mr. Gelardi further explained that "he was experiencing some marital problems" and he did not want his wife to learn that he owned the bonds. Mr. Gelardi asked petitioner to "devise a method whereby he would be able to borrow against the bonds and have the lender accept the coupons only rather than checks for interest". Petitioner testified that he concluded, after doing some research, that Mr. Gelardi could sell the bonds subject to an option to repurchase them at the same price. In this way, the buyer would be entitled to retain the interest coupons which matured during the time the buyer held the bond and the interest would retain its character as tax exempt. Petitioner claims to have structured the transaction in accordance with a case which he found in researching the matter, American National Bank of Austin v. United States, 216 Ct. Cl. 92, 573 F.2d 1201 (1978). Petitioner's testimony is that he helped to "sell" two MAC bonds to Mr. Hyman Kaplan, serial numbers 9C-1484 *99 and 9C-1485, and one MAC bond to Mr. Alvin Meiseles, serial number 9C-1478, in conformity with that structure. At trial, he introduced into evidence copies of letters signed by each of those buyers to Mr. Gelardi giving him an option to repurchase the bonds at any time between July 1, 1981, and December 31, 1981. Petitioner also helped to "sell" other MAC bonds to Messrs. Lubin and Luhrs but those bonds are not at issue in this case and the record does not fully describe those transactions. According to petitioner, Mr. Kaplan paid $ 100,000 for two bonds. Petitioner says that Mr. Kaplan gave the money to Mr. Albano and petitioner never received it. Petitioner acknowledges receiving the money paid by Mr. Meiseles, $ 45,000, but claims to have given that money to Mr. Gelardi. Petitioner claims to have played a much more limited role in connection with the bond purchases made by Messrs. Lang and Hanbury. Petitioner says that Mr. Albano arranged for Mr. Lang to come to his office for a meeting with Mr. Gelardi and that Mr. Gelardi, who appeared to know Mr. Lang, dealt with Mr. Lang directly. Petitioner claims that his only involvement with the bond sales to Messrs. Lang and Hanbury *100 took place during two trips to Florida which he made at Mr. Gelardi's behest. During the first trip, which took place on July 11, 1980, petitioner collected $ 100,000 from Mr. Hanbury and delivered MAC bond serial number 9C-1482 and two receipts signed by Mr. Gelardi. On that trip, petitioner also met with Mr. Lang and collected $ 40,000 from him. Petitioner claims to have given those funds, a total of $ 140,000, to Mr. Gelardi immediately upon his return to New York. During the second trip, which took place on August 1, 1980, petitioner received $ 115,000 from Mr. Lang. Petitioner claims to have given that money to Mr. Gelardi immediately upon his return to New York. Petitioner denies that he ever gave Mr. Lang any MAC bonds or OCAN's. Petitioner acknowledges that he received a total of $ 155,000 from Mr. Lang, $ 40,000 on the first trip to Florida and $ 115,000 on the second, but denies that he received anything more from Mr. Lang. Specifically, he denies receiving $ 149,000 of the $ 304,000, the amount which respondent claims that petitioner received from Mr. Lang. According to petitioner, in late September of 1980, Mr. Gelardi informed him that he was going to Florida *101 to make a big purchase of jewelry and that, if petitioner needed to contact him, petitioner should place a classified advertisement in the Daily News. Several days later, Mr. Gelardi called petitioner and told him that his wife and her father had learned about the bonds and they were going to "take steps for an injunction". He suggested that petitioner contact his clients and tell them to dispose of the bonds to avoid being embroiled in his matrimonial problems. Petitioner states this was his last contact with Mr. Gelardi. Following Mr. Gelardi's call, petitioner contacted Messrs. Kaplan, Meiseles, Luhrs, and Lubin and related to each of them what he had been told by Mr. Gelardi. Messrs. Meiseles and Luhrs told petitioner that they had already disposed of their bonds. Mr. Albano contacted Messrs. Lang and Hanbury and told them of Mr. Gelardi's marital problems and suggested that they dispose of their bonds "incognito". After Mr. Albano's call Mr. Lang took steps to dispose of his two MAC bonds anonymously. He went to the Bahamas where he contacted Portfolio Management Services (PMS), a Bahamian corporation, using the alias "Bill Roberts". PMS instructed Mr. Lang to go to *102 New York, deposit the two MAC bonds into PMS' account at Goldman Sachs, a securities dealer, and his account at First Miami Securities would later be credited with the proceeds of the sale. On September 26, 1980, Mr. Lang, accompanied by petitioner, went to Goldman Sachs' office in New York City. Petitioner handled the deposit of the two MAC bonds into PMS' account while Mr. Lang waited in a sitting room. Petitioner was aware that PMS was a Bahamian corporation. Shortly thereafter, Mr. Lang's account at First Miami Securities was credited with the proceeds from the sale of the bonds. After observing the success Mr. Lang had in cashing the MAC bonds, petitioner asked Mr. Lang if Messrs. Kaplan and Lubin could use the same arrangement to dispose of their MAC bonds. Mr. Lang agreed to allow the use of his account if they shared the expenses Mr. Lang had incurred using the PMS account. On October 16, 1980, Mr. Kaplan and Mrs. Lubin (acting on behalf of her husband), accompanied by petitioner, went to Goldman Sachs. Petitioner deposited Mr. Kaplan's two MAC bonds and Mr. Lubin's one MAC bond into PMS' account at Goldman Sachs while Mr. Kaplan and Mrs. Lubin waited in another room. *103 Petitioner instructed Goldman Sachs to cash the MAC bonds and purchase bonds of comparable quality. Later, Triborough Bridge and Tunnel Authority of New York bonds in the principal amount of $ 240,000 were sent to Mr. Lang's account at First Miami Securities, and Mr. Lang forwarded them to Mr. Kaplan. Mr. Kaplan kept bonds in the principal amount of $ 160,000 and he sent bonds in the principal amount of $ 80,000 to Mrs. Lubin. Mr. Lang charged Mr. Kaplan and Mrs. Lubin for the use of his account. Soon thereafter, petitioner states that he discovered that his Gelardi file was missing. Subsequently, on October 23, 1980, and November 11, 1980, petitioner placed classified advertisements in the Daily News which stated "JG please get in touch with LL". Mr. Gelardi had told petitioner to place such an advertisement to get in touch with him. Petitioner did not receive a response from those advertisements. Petitioner states that he took a number of other steps to find Mr. Gelardi, including hiring a private investigator. The investigator discovered a Mr. John L. Gelardi living at the address on the driver's license which Mr. Gelardi had given to petitioner. On March 17, 1981, petitioner *104 sent a certified letter addressed to Mr. Gelardi at that address. Petitioner received a response from an attorney, Philip Axelrod, who refused to produce Mr. Gelardi for visual inspection and threatened to go to the bar association if petitioner continued to harass his client. Eventually, it became clear that the Mr. Gelardi at that address was not the person whom petitioner had represented. Petitioner has never located his client, Mr. Gelardi. At the outset, we note that the record of this case contains no testimony or other evidence linking petitioner to the theft of the stolen bonds from Shearson American Express. In fact, the District Court judge in Florida before whom the Government presented the criminal charge, transporting stolen securities, against petitioner directed a verdict of acquittal in petitioner's favor and found the evidence against him to be "overwhelmingly circumstantial in nature." Respondent takes the position that petitioner received $ 549,000 from the sale of the stolen bonds during 1980. However, $ 100,000 of that amount consists of the proceeds of the sale of two bonds, serial numbers 9C-1484 and 9C-1485, to Mr. Kaplan. There is no credible evidence *105 that petitioner ever received those funds. Mr. Kaplan testified that he gave the money for those bonds to Mr. Albano. Furthermore, $ 149,000 of the $ 549,000 consists of the proceeds of two MAC bonds, serial numbers 9C-1481 and 9C-1483, purchased by Mr. Lang. Mr. Lang testified that he paid petitioner $ 149,000 for those bonds, but we do not credit Mr. Lang's testimony on that point. In passing, we note that Mr. Lang's testimony at trial was extremely vague. He was confused and confusing about a number of important facts, such as when and where he received the bonds which he purchased. During his testimony in this case, Mr. Lang's principal objective was to avoid testifying in a way which would create a discrepancy with the testimony he had given a number of years earlier in Lang v. Commissioner, T.C. Memo. 1983-318. The issue in that case was whether he had a cost basis of $ 304,000 in the bonds which he had purchased. It was only necessary for him to prove that he had paid that amount to someone. It is clear that petitioner received $ 155,000 of the $ 304,000 from Mr. Lang; i.e., $ 40,000 on July 11, 1980, and $ 115,000 on August 1, 1980. *106 We are not persuaded from Mr. Lang's testimony that he paid the additional $ 149,000 to petitioner, as opposed to someone else, such as Mr. Albano or Mr. Gelardi. Without Mr. Lang's testimony, there is no credible evidence that Mr. Lang paid more than $ 155,000 to petitioner during 1980. Accordingly, we find, as petitioner acknowledges, that he received a total of $ 300,000 from Messrs. Meiseles, Lang, and Hanbury during 1980. Petitioner states that he acted as Mr. Gelardi's agent in these matters and that "he promptly turned over all currency he was given in connection with all bond transactions to Mr. Gelardi". Contrary to respondent's argument that "petitioner was part of the 'scheme to sell stolen bonds'", petitioner argues that "he was, quite simply, defrauded". There is no credible evidence in the record which contradicts petitioner's explanation that he was acting as Mr. Gelardi's attorney and that he turned over to Mr. Gelardi the $ 300,000 which he received from Messrs. Meiseles, Lang, and Hanbury. Furthermore, there is credible evidence in the record which supports petitioner's testimony. For example, Mr. Mark Tulip, an attorney who shared the same suite of offices *107 with petitioner in 1980, testified to his meeting with Mr. Gelardi and their discussion of Mr. Gelardi's interest in acquiring "brownstones and small apartment buildings in the Fort Green area, specifically South Portland, South Oxford, South Elliot Place, and the blocks around there". Mr. Gelardi's existence was also confirmed by Messrs. Kaplan and Albano, but we find Mr. Tulip's testimony particularly important because he had no other connection to the facts of this case and no incentive to lie. Since there is no direct evidence that petitioner's explanation is false, respondent argues that petitioner's testimony is unbelievable and the Court should disregard it. Respondent argues that petitioner received substantial sums of money and has no proof other than his testimony that he paid such amounts to Mr. Gelardi or anyone else. Respondent attempts to show inconsistencies in petitioner's testimony and the testimony of petitioner's witnesses. Respondent also argues that there are badges of fraud from which fraudulent intent can be inferred. We agree with respondent that there are aspects of petitioner's story which are disturbing. For example, we are given pause by the fact *108 that the subject transactions took place entirely in cash. We are also given pause by petitioner's continuing involvement in the resale of Mr. Lang's, Mr. Kaplan's, and Mrs. Lubin's bonds through Goldman Sachs. Nevertheless, as mentioned above, both of the issues in this case turn on petitioner's credibility and whether we believe his version of the facts. We had an opportunity to observe petitioner not only during his direct examination and during respondent's extensive cross-examination of him, but also over the 4 days which it took to try this case. In our opinion, petitioner was a credible witness. We believe the essential details of his version of the facts. Specifically, we believe that petitioner thought that he was acting for a client, Mr. Gelardi, in undertaking to "sell" the MAC bonds. We also believe that he only received cash in the amount of $ 300,000 from Messrs. Meiseles, Lang, and Hanbury and that he gave the money to Mr. Gelardi. Accordingly, we hereby reject the determination made by respondent in the subject notice of deficiency. In light of the above, it is unnecessary for us to address petitioner's contention that we erred at trial by not receiving into *109 evidence respondent's Appeals Transmittal Memorandum and Supporting Statement. It is also unnecessary to address petitioner's contentions regarding the burden of proof. Petitioner argued that his burden of proving a prima facie case is lower than it would normally be due to the fact that the deficiency is based on an omission from income. Petitioner also contended that he had introduced sufficient evidence to establish a prima facie case and that the burden of going forward with the evidence should be shifted to respondent. For the foregoing reasons, Decision will be entered for petitioner.